# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | 2:06-cr-0281-HDM-LRL |
| ) | Motion to Suppress (#17) |
| DARREN DULANEY, ) | |
| Defendant. ) | |

## REPORT & RECOMMENDATION

The defendant, Darren Dulaney, is awaiting trial on a charge of Possession with Intent to Distribute a Controlled Substance, namely, cocaine base, in violation of 21 U.S.C. § 841(a)(1). He has filed a Motion to Suppress Evidence for Fourth and Fifth Amendment Violation (#17), in which he contends that (1) the traffic stop that led to the discovery of cocaine base was unlawful because the conduct for which Dulaney was pulled over did not violate a traffic law; (2) even if the traffic stop was lawful, the officer who stopped Dulaney impermissibly expanded the scope of his investigation beyond the original purpose of the stop; and (3) Dulaney's consent to the search of his car and subsequent search of his home was tainted by the above-referenced illegalities. Having considered Dulaney's Motion (#17), the government's Response (#20), and the testimony adduced at the evidentiary hearing on December 5, 2006, the court submits this Report and Recommendation.

### THE EVIDENCE

The government called one witness at the hearing, Deputy City Marshal David Compson, who while on traffic patrol stopped Dulaney's car and found the cocaine. Dulaney called one witness, April Siler, Dulaney's fiancee, who was in the car when Dulaney was stopped. Based

on the testimony, the court finds that the following facts have been established by a preponderance of the evidence.

On July 6, 2006, Deputy Compson was on routine traffic patrol in a marked vehicle in the far northwest area of the City of Las Vegas. He received information from the Gang Task Force that an African American male who was a convicted felon would likely be carrying drugs in a certain white Ford Expedition. He was asked to stop the Expedition if there was probable cause to do so. At about noon, Deputy Compson spotted the Expedition in question exceeding the speed limit southbound on a frontage road named Oso Blanca Road alongside U.S. 95 a little north of the intersection of U.S. 95 and Durango Drive. Compson followed the Expedition on Oso Blanca as it stopped at a red light at Durango. On the green left turn arrow the Expedition turned left from the left lane into the left hand of three through lanes of traffic on Durango Drive, heading in a northeasterly direction toward U.S. 95, which was several hundred feet away. At that point the Expedition could have either continued on Durango and passed under U.S. 95, or, before it reached U.S. 95, turned right into the on-ramp to U.S. 95 south. The driver of the Expedition chose the latter course. Deputy Compson followed the Expedition a short distance on Durango Drive as it swept rightward -- without using its turn signal -- across three traffic lanes into the dedicated right turn lane and then the on-ramp to U.S. 95 south. Compson activated his overhead lights and stopped the Expedition for failure to use turn signal when changing lanes, which is a violation of NRS 484.343(1).[1]

Behind the wheel was the defendant, Darren Dulaney. In the front passenger seat was Dulaney's fiancee, April Siler. Deputy Compson explained why he stopped Dulaney, and

---

[1] NRS 484.343(1) provides, in pertinent part:

> A driver shall not turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety, and then only after ... giving an appropriate signal if any other vehicle may be affected by such movement.

2

requested his driver's license, vehicle registration and proof of insurance. Dulaney complied. Compson's records check revealed that Dulaney was a convicted felon, and that the address shown on the convicted felon report was different from the address on Dulaney's driver's license. Compson asked Dulaney to step out of his car. In the meantime, Deputy Hunt arrived as Compson's backup. At this point it was Deputy Compson's intention to arrest Dulaney for failing to change address as a convicted felon. Compson asked Dulaney whether there were weapons or drugs in the car. Dulaney said, "No." Compson asked, "Do you mind if I check?" Dulaney responded, "You can look if you want." At Compson's request, Dulaney signed a consent to search form that authorized the officers to search the "complete interior + exterior of vehicle and bags/containers within." *See* Government's Exhibit 2. Dulaney was then handcuffed for reasons of officer safety.

After requesting Ms. Siler to exit the vehicle, Deputy Compson searched the interior of the Expedition. Behind the driver's seat he found a backpack, which contained a suspected controlled substance, *viz*., cocaine base. Compson notified the Gang Task Force that drugs had been found in Dulaney's vehicle, and requested a canine unit. The dog alerted on the same backpack, but found no additional drugs in the vehicle. Thereafter, both Dulaney and Ms. Siler signed forms consenting to the search of their residence at 8108 Caspian Moon Drive in Las Vegas.[2]

**DISCUSSION**

*1. Validity of the Stop*

Because an automobile stop is a seizure of a person, the stop must comply with the Fourth Amendment's requirement that it not be unreasonable under the circumstances. *United States v. Olafson*, 213 F.2d 435, 439 (9th Cir. 2000). "[T]he decision to stop an automobile is

---

[2] Ms. Siler's testimony did not contradict the testimony of Trooper Compson in any material respect.

3

reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Indeed, a traffic stop is proper even though the traffic violation is a minor one. *See United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990)("When an officer observes a traffic offense – however minor – he has probable cause to stop the driver of the vehicle ..."). "Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis." *See Whren*, 517 U.S. at 813.

Deputy Compson testified that he saw Dulaney drive the Expedition to the right across three traffic lanes without giving a right-turn signal. The testimony is uncontradicted. The conduct clearly constitutes a violation of NRS 484.343(1). Deputy Compson had probable cause to believe a traffic violation occurred. The traffic stop was lawful.

The dispositive issues in this case are whether it was reasonable for Deputy Compson to ask, at the time that he did, whether there were any guns or drugs in Dulaney's vehicle, and if so, whether Dulaney voluntarily consented to the search of the vehicle. For the reasons that follow, the court finds that to the extent Deputy Compson asked about the presence of firearms in Dulaney's vehicle, he was justified in doing so in the interest of officer safety. The court also finds that Dulaney's subsequent consent to the search of his vehicle was voluntary.

*2. The Question Concerning Weapons or Drugs*

It is well settled that police officers conducting a traffic stop may "take such steps as [are] reasonably necessary to protect their personal safety." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

> The touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977). "In balancing [these] interests ..., federal

4

courts have allowed considerations of officer safety to outweigh fairly intrusive conduct during a traffic stop." *United States v. Holt*, 264 F.3d 1215,1223 (10th Cir. 2001). For example, in *Mimms*, the Supreme Court held that the Fourth Amendment is not offended when, for reasons of officer safety, an officer orders a driver to step out of his vehicle during a routine traffic stop, even when the officer has no reason to "suspect foul play" from the driver and there is "nothing unusual or suspicious about his behavior." *United States v. Mimms*, 434 U.S. at 109.

> We think it too plain for argument that the State's proffered justification -- the safety of the officer -- is both legitimate and weighty. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio, supra*, 392 U.S. at 23. And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile.

*Id.* at 110.

In *Maryland v. Wilson*, 519 U.S. 408, 413 (1997), the Court applied the rule of *Mimms* to passengers as well as to drivers:

> On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger. Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops. Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 71, 33 (1994)....
> [T]he fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer.

In upholding an officer's discretion during a routine traffic stop to exercise sufficient control of the situation to ensure the officer's own safety, the court in *United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005), held that "an officer may order a passenger who voluntarily gets out of a lawfully stopped vehicle *back into* the automobile without violating the passenger's Fourth Amendment rights." (Emphasis in original.) The court concluded:

> In the final calculus, we think it best left to the discretion of the officers in the field who confront myriad circumstances we can only begin to imagine from the relative safety of our chambers. We hold that under the Fourth Amendment it is reasonable for an officer to order a passenger back into an automobile that he

5

> voluntarily exited because the concerns for officer safety originally announced in *Wilson,* and specifically the need for officers to exercise control over individuals encountered during a traffic stop, outweigh the marginal intrusion on the passenger's liberty interest.

*Id.* at 1034.

Moreover, during a routine traffic stop,

> the motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history. The justification for detaining a motorist to obtain a criminal history check is, in part, officer safety. *See, e.g., United States v. McRae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996)("[Records] checks are run largely to protect the officer. Considering the tragedy of the many officers who are shot during routine traffic stops ..., the almost simultaneous computer check of a person's criminal record ... is reasonable and hardly intrusive."); *United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001)("The request for criminal histories as part of a routine computer check is justified for officer safety."); *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996)("The results of a criminal history check could indicate whether further back-up or other safety precautions were necessary.") By determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop.

*United States v. Holt*, *supra*, 264 F.3d at 1221-22. Alternatively, "an officer may also obtain information about the existence of a loaded weapon by simply asking the motorist if there is a loaded weapon in the vehicle. Indeed, straightforwardly asking this question is often less intrusive than many of the procedures authorized by our sister circuits." *Id.* at 1223. "[A]ny response the officer receives in response to this question will be helpful in appraising the risk presented more accurately." *Id.* at 1224.

> Given the dangers inherent in all traffic stops, we hold that the government's interest in officer safety outweighs a motorist's interest in not being asked about the presence of loaded weapons. This balance tips in the government's favor even when the officer lacks particularized suspicion that the motorist possesses loaded weapons and regardless of whether the officer subjectively fears the motorist.

*Id.* at 1226.

Here, Deputy Compson had been advised by the Gang Task Force that the driver of the Expedition he was asked to look for was a convicted felon who was suspected of transporting narcotics. Compson effected a lawful traffic stop on the Expedition for a turn signal violation. In the vehicle were Dulaney and a passenger, April Siler. A records check confirmed that Dulaney was a convicted felon, and reflected that the address in the police data base did not match the address on Dulaney's driver's license. At this point Compson had probable cause to arrest Dulaney for failing to register his current address. In order to minimize a potential threat to his own safety, Deputy Compson attempted to determine whether Dulaney had immediate access to a firearm: Compson required Dulaney to step out of the vehicle. While Ms. Siler remained in the vehicle Compson talked briefly to Dulaney about his apparent failure to register, then simply asked Dulaney, who was under no compulsion to answer, whether there were any weapons or drugs in the car. The issue before the court is whether the mere asking of the question constituted an unreasonable, arbitrary interference with Dulaney's right to personal security that outweighed the public interest in Deputy Compson's safety as a police officer. The court finds that it did not.

This court agrees with the approach adopted by the Tenth Circuit in *United States v. Holt*, *supra*. There the court held that "the government's interest in officer safety outweighs a motorist's interest in not being asked about the presence of loaded weapons." 264 F.3d at 1226. This is so, the court said, "even when the officer lacks particularized suspicion that the motorist possesses loaded weapons and regardless of whether the officer subjectively fears the motorist." *Id*. Hence, even if Deputy Compson had not received information from the Gang Task Force concerning the Dulaney's alleged narcotics activities, he would have been within his rights to simply *ask* Dulaney whether there were weapons in the car. The fact is, however, that the Gang Task Force told Compson that the driver of the Expedition was a convicted felon who was suspected of transporting narcotics in the vehicle. That additional piece of information provided Compson an objective basis to suspect that Dulaney may be armed. Indeed, Compson would

7

have been justified in frisking Dulaney, let alone in merely asking him a question.

*United States v. Mendez*, 467 F.3d 1162 (9th Cir. 2006), does not undermine this result. In a divided opinion the issue for the majority was whether there was reasonable suspicion of ongoing criminal activity sufficient to justify an interrogation and search. Notwithstanding that the dissent grounded its position squarely on concerns for officer safety, the majority expressly declined to reach that issue because it was neither briefed nor argued by the government. "We simply preserve an issue for another day." *Id.* at 1176.

*3. Consent*

In response to Compson's question whether there were weapons or drugs in the car, Dulaney said, "No." Compson then asked, "Do you mind if I check?" To which Dulaney freely responded, "You can look if you want." Dulaney then signed a consent to search form that authorized the officers to search the "complete interior + exterior of vehicle and bags/containers within." The record contains no evidence that Dulaney's willingness to allow a search of his vehicle was induced by a show of force or a threat of force by Deputy Compson, or that Dulaney did not understand what he was doing. Indeed, Dulaney does not allege that his consent was coerced or that he didn't understand what he was signing. He argues only that his consent was tainted by the "prior illegalities," *viz.*, the alleged unlawful traffic stop and the alleged unlawful expansion of questioning beyond the scope of the traffic stop itself.

The court has found that the traffic stop was lawful, and that Deputy Compson's question concerning a firearm in the vehicle did not constitute an unlawful expansion of questioning beyond the scope of the traffic stop.[3]  Hence, there were no prior illegalities that could have

---

[3] Although this court finds that during a routine traffic stop an officer may, in the interest of officer safety, ask the occupants of the stopped vehicle whether there are any weapons in the vehicle, the court expresses no view on the legality or propriety of also, or in the alternative, asking whether there are *drugs* in the vehicle. Here, Deputy Compson asked whether there were weapons or drugs in the vehicle. Because Dulaney did not admit there were drugs in the vehicle, the fact that Compson asked about drugs as well as guns does not affect the resolution of Dulaney's motion.

8

contaminated Dulaney's consent.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned U.S. Magistrate Judge that Dulaney's Motion to Suppress Evidence for Fourth and Fifth Amendment Violation (#17) should be denied.

DATED this 17th day of January, 2007.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**